# Illinois Official Reports

## Appellate Court

---

**People v. Varnauskas, 2018 IL App (3d) 150654**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLNOIS, Plaintiff-Appellee, v. STEVEN J. VARNAUSKAS, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0654 |
| Filed | July 25, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Henry County, No. 14-CF-334; the Hon. Terence M. Patton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Andrew J. Boyd, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Matthew Schutte, State's Attorney, of Cambridge (Patrick Delfino, Lawrence M. Bauer, and Jasmine D. Morton, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justice Schmidt concurred in the judgment and opinion.<br>Justice McDade dissented, with opinion. |

¶ 1 Following a jury trial, defendant, Steven J. Varnauskas, was convicted of two counts of controlled substance trafficking (720 ILCS 570/401.1(a) (West 2014)) and sentenced to two concurrent 40-year terms of imprisonment. On appeal, defendant argues that the trial court erred in denying his motion to suppress evidence. We affirm.

¶ 2                                    FACTS

¶ 3 On November 14, 2014, at 11 p.m., Illinois State Police Trooper Sean Veryzer was in his squad car in the center median of Interstate 80 (I-80) when defendant's vehicle passed him traveling eastbound. Veryzer noticed that defendant's rear license plate was obscured by an empty bicycle rack attached to the car. Based on the fact that the license place was obscured by the bicycle rack, Veryzer executed a traffic stop of defendant's vehicle for a suspected violation of section 3-413(b) of the Illinois Vehicle Code (625 ILCS 5/3-413(b) (West 2014)). At the time, section 3-413(b) provided:

> "Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from swinging and at a height of not less than 5 inches from the ground, measuring from the bottom of such plate, *in a place and position to be clearly visible and shall be maintained in a condition to be clearly legible, free from any materials that would obstruct the visibility of the plate*. *** Registration stickers issued as evidence of renewed annual registration shall be attached to registration plates as required by the Secretary of State, and be clearly visible at all times." (Emphasis added.) *Id.*

¶ 4 During the traffic stop, Veryzer's canine partner (a drug detection dog) gave a positive alert for the presence of drugs in defendant's vehicle. Based on the dog's alert, Veryzer and another police trooper searched defendant's vehicle on the side of the road. Due to the weather being below freezing at 20 degrees Fahrenheit and due to safety issues regarding oncoming traffic and low visibility because it was dark outside, the troopers decided to relocate defendant's vehicle to a nearby police station in order to continue the search. At the police station, Veryzer located two kilograms of suspected heroin and a kilogram of suspected cocaine wrapped in black material, in a void area of defendant's vehicle located by the engine and below the car's windshield. Preliminary field tests of the suspected drugs tested positive for heroin and cocaine. Defendant was arrested and charged with two counts of controlled substance trafficking (720 ILCS 570/401.1(a) (West 2014)), possession with the intent to deliver heroin (*id.* § 401(a)(1)(D)), possession with the intent to deliver cocaine (*id.* § 401(a)(2)(D)), unlawful possession of a controlled substance (heroin) (*id.* § 402(a)(1)(D)), and unlawful possession of a controlled substance (cocaine) (*id.* § 402(a)(2)(D)).

¶ 5 Prior to trial, defendant filed a motion to suppress the evidence found during the search of his vehicle, arguing the traffic stop was initiated without probable cause or reasonable suspicion because the bicycle rack was not a violation of section 3-413(b) of the Vehicle Code because it was not attached to the license plate. In support of his motion to suppress, defendant cited *People v. Gaytan*, 2013 IL App (4th) 120217, ¶¶ 44-45, in which the Fourth District Appellate Court held that a trailer ball hitch on a vehicle did not violate the version of section 3-413(b) of the Vehicle Code in effect at that time, which required license plates to be "free from any materials that would obstruct the visibility of the plate, including, but not limited to,

glass covers and plastic covers" (625 ILCS 5/3-413(b) (West 2010)). Th*e Gaytan* court reasoned that the trailer ball hitch did not violate section 3-413(b) of the Vehicle Code because the trailer ball hitch was not attached to the license plate and the example violations provided by the statute (license plate covers) were items attached to the license plate. *Gaytan*, 2013 IL App (4th) 120217, ¶ 44.

¶ 6    In this case, on March 26, 2015, the trial court denied defendant's motion to suppress, noting that the Fourth District's decision in *Gaytan* was pending an appeal in the Illinois Supreme Court; although the appellate court in *Gaytan* held that the version of section 3-413(b) applicable in that case only encompassed obstructions attached to the license plate itself, the statute had since been changed to remove the language referencing license plate covers; and the bicycle rack in this case was a distinguishable obstruction from the ball hitch obstruction in *Gaytan* because the ball hitch only slightly obstructed the license plate from certain angles, whereas the bicycle rack straps in this case went down vertically over the license plate to completely cover portions of the license plate.

¶ 7    On May 25, 2015, the trial court noted that the Illinois Supreme Court had issued its ruling in *Gaytan* (*People v. Gaytan*, 2015 IL 116223) and asked whether defendant's attorney needed additional time to review the *Gaytan* decision to decide whether the decision impacted defendant's earlier motion to suppress. The defendant's attorney noted that although the Illinois Supreme Court indicated the applicable version of section 3-413(b) could be read as only encompassing obstructions physically attached to the license plate, the Illinois Supreme Court also noted section 3-413(b) was ambiguous so that the officers in that case had an objectively reasonable belief that the trailer hitch violated section 3-413(b). The defendant's attorney indicated that *Gaytan*, therefore, was not supportive of defendant's motion to suppress.

¶ 8    On June 4, 2015, defendant's jury trial began. Veryzer testified that he executed a traffic stop of defendant's vehicle on November 14, 2014, after he observed that defendant's rear license plate was obstructed and that only two digits of the license plate could be read. Photographs entered into evidence showed that defendant's license plate was obstructed by the straps of an empty bicycle rack. A video of the traffic stop entered into evidence showed that straps of the bicycle rack remained secured over the license plate, did not move as the car traveled on the highway, and obscured at least two digits of the license plate from every angle.

¶ 9    Upon stopping defendant's vehicle, Veryzer obtained defendant's passport because defendant did not have his driver's license with him. Veryzer also obtained a rental agreement for the vehicle. Defendant's name was not on the rental agreement. The rental agreement indicated that the vehicle was due to be returned to Los Angeles two days later, on November 16, 2014. Veryzer asked defendant to sit in the front passenger seat of his squad car so that Veryzer could speak with defendant and determine if defendant was authorized to drive the vehicle. At the same time, Veryzer checked for defendant's driver's license information via his telecommunications system. Veryzer received information that defendant had a valid driver's license. Defendant indicated he was coming from Colorado and the vehicle had been rented by his friend, Daniel Melendez, in Los Angeles, California. Defendant also indicated that he had flown into Los Angeles and was traveling via the car to see his mother in Connecticut. Defendant was unable to specify which day he had flown into Los Angeles and was not sure if he was going to return the rental vehicle to California. Defendant told Veryzer that there was no bicycle on the bicycle rack because he had sold it in Colorado. Trooper Jarrod Johnson

arrived on scene and continued to fill out a warning ticket for defendant while Veryzer walked his canine partner around defendant's vehicle.

¶ 10    Veryzer testified regarding the procedure for walking the canine around a vehicle, which Veryzer had performed on defendant's vehicle. Veryzer indicated that he attaches a six-foot lead to one of the canine's two collars and brings the canine to the front of the vehicle (within three feet of the vehicle) and places the canine in the sit position. Veryzer would then give the canine the command to "seek, find dope," which is the canine's trained command to look for odors of narcotics that he was trained to alert on—cocaine, heroin, methamphetamines, crack cocaine, and cannabis. Veryzer would then walk the canine around the vehicle twice counterclockwise, returning to the front the vehicle. Veryzer testified that on the second rotation of walking his canine partner around defendant's vehicle, his canine partner came to a sudden stop at the trunk area of defendant's vehicle. Veryzer described the canine alerting to having found narcotics as when the canine has "slowed his process, snapped his head and body back to the left, and began taking short, quick breaths." After alerting, the canine would then sit as a final response because he is trained to sit when he positively recognizes one of the five odors that he is trained in.

¶ 11    After his canine positively alerted to the presence of drugs in defendant's vehicle, Veryzer then informed defendant that the canine had alerted on his vehicle and a probable cause search would be conducted. For approximately 20 minutes, Veryzer and Johnson searched defendant's vehicle. Veryzer testified that he and Trooper Johnson conducted a cursory search of defendant's vehicle by checking all the bags and general locations of the vehicle where drugs have been found during other vehicle searches in the past, including searching inside the bags and luggage that were in the trunk of defendant's vehicle, the interior, under the seats, under the dashboard, and inside the doors by Veryzer sticking a wedge into the doors to be able to see into the doors.

¶ 12    The troopers then decided to relocate the search to a location where there would be more light to better see into various areas of the vehicle and where it would be safer and warmer because they could not see due to the darkness. Veryzer also indicated that it was dangerous on the side of the road and the temperature was about 20 degrees outside. They relocated defendant's vehicle to the Geneseo Police Department and, after searching the vehicle for 10 or 15 minutes, they found the drugs under the hood in the engine compartment in an area covered by a black piece of metal or plastic.

¶ 13    During the search of the vehicle, receipts for fast food, gas, and a hotel room were found. The rental agreement and receipts showed that the vehicle was rented on November 9, 2014, at 7:59 p.m. at the Los Angeles airport and stops were made in Los Angeles, at 6:32 a.m. on November 12, 2014; in Las Vegas, Nevada, on November 12, 2014; in St. George, Utah, at 6:38 a.m. on November 13, 2014; overnight at a hotel located in the middle of Colorado (Frisco, Colorado); in Frisco, Colorado, at approximately 7 a.m. on November 14, 2014; in the northeast part of Colorado (Atwood, Colorado) on November 14, 2014; in Elm Creek, Nebraska, at 2:21 p.m. on November 14, 2014; in Shelby, Iowa, on November 14, 2014; and in Walcott, Iowa, at 9:51 p.m. on November 14, 2014. All purchases were made in cash. Defendant was stopped by Veryzer, in Illinois, at 10:59 p.m. on November 14, 2014.

¶ 14    Veryzer testified that he had been employed as a certified canine handler with the Illinois State Police for four years and had been a trooper with the Illinois State Police for seven years. Veryzer had taken a 10-week certification course with his canine partner. He also completed

- 4 -

over 305 hours of criminal patrol training for the interdiction of terrorists and stolen vehicles and the seizure of narcotics, guns, and currency from trafficking of illegal narcotics, guns, and stolen vehicles. Veryzer had personally seized approximately 46 large loads of narcotics and was on scene with other officers during drug seizures, and he was able to see where different narcotics were hidden in the various vehicles.

¶ 15 Veryzer testified, based upon his experience and training, that the cocaine and heroin drug trafficking flow originates on the west coast and travels toward the east coast via interstate highways, including I-80, and the currency for those drug transactions returns from the east to the west. Veryzer testified that it was common for people transporting the narcotics to be in third-party rental vehicles to allow the transporters to plausibly deny knowledge of the narcotics being in the vehicle. Veryzer also testified that it was common for narcotic transporters to pay for expenses using cash and to keep receipts to prove their expenses.

¶ 16 Veryzer testified that once he began searching defendant's vehicle at the police station, it took 10 to 15 minutes to find the drugs in the empty space located under the hood of the car and near the base of the windshield. He explained that finding the drugs took as long as it did because, once an "in-depth" search was undertaken, everything was done in "a methodical manner." Once Veryzer had searched defendant's luggage and other places in or around the vehicle where he had discovered drugs in other vehicle searches in the past, Veryzer continued searching other locations of the vehicle. He was not able to see the black packages of narcotics in the void compartment area under the windshield on the roadside by just shining a flashlight because a flat piece of plastic or metal covered it. That piece of metal or plastic could easily be removed by removing some clips that covered the compartment, which was part of the vehicle from the factory, was not modified, and could be easily accessed. Veryzer had never encountered a drug seizure with drugs hidden in that particular location of a vehicle.

¶ 17 At the close of the State's evidence, defendant made a motion for a directed verdict, arguing that the State was unable to prove defendant had knowledge of the drugs in the vehicle. The trial court denied the motion, finding that taking all reasonable inferences from the evidence in the light most favorable to the State, a rational fact finder could find the defendant guilty. Defendant chose not to testify. The jury found defendant guilty on all charged counts. Defendant was convicted on two counts of controlled substance trafficking and was sentenced to two concurrent 40-year terms of imprisonment. Defendant appealed.

¶ 18                                                    ANALYSIS
¶ 19                                              I. Traffic Stop
¶ 20 On appeal, defendant argues the trial court erred in denying his motion to suppress because the initial stop of his vehicle was unlawful. The State argues the trial court properly denied defendant's motion to suppress evidence.

¶ 21 Both the fourth amendment of the United States Constitution, applicable to the state through the fourteenth amendment (*Mapp v. Ohio*, 367 U.S. 643 (1961); *People v. James*, 163 Ill. 2d 302, 311 (1994)), and article I, section 6, of the Illinois Constitution of 1970 guarantee Illinois citizens the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *Gaytan*, 2015 IL 116223, ¶ 20. The constitutional safeguard of protecting citizens from unreasonable searches and seizures protects against unreasonable warrantless searches. *People v. Stout*, 106 Ill. 2d 77, 86 (1985). A stop of a vehicle based on a suspected violation of the law constitutes a seizure. *Gaytan*, 2015 IL

116223, ¶ 20. For a traffic stop to comport with the requirement of reasonableness under constitutional guarantees, the police officer conducting the stop must have at least a reasonable, articulable suspicion that a violation of the law has occurred. *Id.* If reasonable suspicion is lacking, the traffic stop is unconstitutional, and any evidence obtained as a result of the stop will generally be inadmissible. *Id.*

¶ 22     When reviewing a trial court's ruling on a motion to suppress evidence, a two-part test is applied so that (1) the trial court's factual findings are upheld unless they are against the manifest weight of the evidence and (2) the trial court's ultimate legal conclusion as to whether suppression is warranted is reviewed *de novo*. *Id.* ¶ 18. At a hearing on a motion to suppress brought by defendant claiming he was aggrieved by an illegal search and seizure, the burden is on that defendant to prove that the search and seizure were unlawful. *Stout*, 106 Ill. 2d at 88.

¶ 23     Here, the State argues that the traffic stop in this case was lawful based on Veryzer's reasonable suspicion that the empty bicycle rack on defendant's vehicle was an obstruction to the license plate in violation of section 3-413(b) of the Vehicle Code. In construing a statute, the primary objective is to give effect to the legislature's intent, with the presumption that the legislature did not intend to create absurd, inconvenient, or unjust results. *Gaytan*, 2015 IL 116223, ¶ 23. The best indication of the legislature's intent is the language of the statute. *Id.* The construction of a statute is a question of law to which we apply *de novo* review. *Id.*

¶ 24     The Illinois Supreme Court in *Gaytan* found that a prior version of section 3-413(b) was ambiguous, where the statute required that every registration plate shall be securely fastened to the vehicle "in a place and position to be clearly visible and shall be maintained in a condition to be clearly legible, free from any materials that would obstruct the visibility of the plate, including, but not limited to, glass covers and plastic covers" (625 ILCS 5/3-413(b) (West 2010)). *Gaytan*, 2015 IL 116223, ¶¶ 30-31, 39. The Illinois Supreme Court noted the word "materials" in section 3-413(b) could have been interpreted either as (1) prohibiting only items attached to the license plate itself because the only examples of the prohibited materials provided in the statute were license plate covers (an item attached to the plate itself) or (2) prohibiting any obstructing object whatsoever. *Id.* ¶¶ 30-31. Because the statute was deemed ambiguous in *Gaytan*, the Illinois Supreme Court invoked the rule of lenity and applied the more lenient interpretation of section 3-413(b) as prohibiting only those objects that obstructed the visibility and the legibility of the license plate that were physically connected or attached to the plate itself. *Id.* ¶ 39. Having concluded that section 3-431(b) was ambiguous, the Illinois Supreme Court "encourage[d] the General Assembly to revisit this statute," noting that it would be helpful if the legislature clarified what equipment and accessories attached to a vehicle near the license plate were prohibited. *Id.* ¶ 40. Under the circumstances of that case, wherein the statute was found to be ambiguous, the Illinois Supreme Court further concluded that it was objectively reasonable for the officers to believe that the trailer hitch violated section 3-413(b) so that the vehicle stop was constitutionally valid under the fourth amendment. *Id.* ¶ 48.

¶ 25     In 2014, at the time of the traffic stop in this case, section 3-413(b) of the Vehicle Code had been revised, so that the prohibition against "registration plate covers" was moved from subsection (b) to subsection (g). See 625 ILCS 5/3-413(b), (g) (West 2014). Subsection (b) did not reference license plate covers, mandating that every registration plate shall be securely fastened to the vehicle "in a place and position to be clearly visible and shall be maintained in a condition to be clearly legible, free from any materials that would obstruct the visibility of

the plate." *Id.* § 3-413(b). Subsection (g) indicated, "[a] person may not operate any motor vehicle that is equipped with registration plate covers." *Id.* § 3-413(g). The revised language of section 3-413(b) removed any ambiguity as to whether prohibited obstructions were only those attached to the license plate, making the statute clearly prohibitive of any materials that would obstruct the visibility of a license plate.

¶ 26    In this case, the empty bicycle rack was affixed to the vehicle in such a way that at least two bars or straps of the bicycle rack were secured in a vertical position over the license plate, covering at least two digits of the license plate. The ends of the straps of the bicycle rack obstructed the license plate at times when the car was traveling and when the car was at a stop. We need not address the question of whether the flapping ends of the straps constituted an obstruction under section 3-413(b) because the video and photographs showed that black bars or straps of the bicycle rack lay securely over the license plate, obstructing the visibility of the license plate, and at least two digits of the license plate were not legible. Therefore, we conclude that the manner in which the bicycle rack was attached to the vehicle in this case constituted a violation of section 3-413(b) of the Vehicle Code. Thus, the trial court did not err in denying defendant's motion to suppress where Veryzer reasonably believed the condition of defendant's vehicle violated section 3-413(b).

¶ 27    Defendant additionally argues that his counsel provided ineffective assistance by indicating that the Illinois Supreme Court's decision in *Gaytan* was not supportive of the argument in defendant's motion to suppress that the traffic stop was unlawful. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (providing that claim of ineffective assistance has two elements: (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant). As we discussed above, the condition of defendant's vehicle at the time of the traffic stop in this case violated section 3-413(b) of the Vehicle Code. The Illinois Supreme Court in *Gaytan* held that the prior version of section 3-413(b) was ambiguous and concluded that it was objectively reasonable for the officers to believe that the trailer hitch in that case violated section 3-413(b). See *Gaytan*, 2015 IL 116223, ¶¶ 30-31, 48. Under the *Gaytan* decision, even if the bicycle rack were not a prohibited obstruction, Veryzer's understanding of the statute would have been objectively reasonable to provide the reasonable suspicion necessary to effectuate a lawful stop of defendant's vehicle. Therefore, the decision of defendant's counsel to refrain from presenting any legal arguments based on the *Gaytan* decision in support of defendant's motion to suppress was reasonable, and his performance did not prejudice defendant.

¶ 28                              II. Dissipation of Probable Cause

¶ 29    For the first time, on appeal, defendant argues that any probable cause developed during the course of the traffic stop dissipated after no illegal drugs were found in the vehicle during the roadside search and prior to the vehicle being moved to another location. Defendant concedes that he did not preserve this claimed error for appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both an objection at the time of trial and the inclusion of the issue in a posttrial motion are required to preserve an issue for review). In light of his forfeiture of this claim for appellate review, defendant requests that we review the purported error for plain error or, in the alternative, as a claim of ineffective assistance of counsel.

¶ 30    Under the plain error doctrine a reviewing court may consider unpreserved error when

"(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

Under both prongs of the plain error doctrine, the burden of persuasion remains with defendant. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). The first step in a plain error analysis is for the reviewing court to determine whether any error occurred. *Id.*

¶ 31    The constitutional safeguards of article I, section 6, of the Illinois Constitution, and the fourth amendment to the United States Constitution, prohibit warrantless searches that are unreasonable. *Stout*, 106 Ill. 2d at 86 (citing *United States v. Rabinowitz*, 339 U.S. 56 (1950); *People v. Watkins*, 19 Ill. 2d 11 (1960)). The critical issue is whether the situation that confronts the officer justifies the search. *Id.* What constitutes probable cause for a search or seizure must be determined from the standpoint of the arresting officer, with his skill and knowledge, rather than from the standpoint of the average citizen under similar circumstances. *Id.* Police officers often must act upon a quick appraisal of the data before them, and the reasonableness of the officers' conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals. *Id.* at 86-87.

¶ 32    When an officer has sufficient facts to support probable cause that a vehicle contains contraband, the vehicle may be searched without a warrant, including any interior compartments of the vehicle that might reasonably contain the contraband. *People v. Contreras*, 2014 IL App (1st) 131889, ¶ 28. Probable cause is a fluid construct that is dependent upon the assessment of probabilities in a particular factual context, with the underlying principle being the reasonable belief of guilt. *Id.* ¶ 29. In determining whether probable cause for a search existed, a court examines the events leading up to the search or seizure viewed from the standpoint of an objectively reasonable law enforcement officer. *Id.*

¶ 33    In this case, the evidence of the canine alerting to an odor of drugs provided probable cause for the troopers to believe that defendant's vehicle contained drugs and to support a search of defendant's vehicle. After searching all readily accessible areas of the vehicle, the troopers decided that continuing to search the vehicle in the dark, alongside the highway, in freezing temperatures, was unsafe and impractical. Under the circumstances of this case, the probable cause that supported the search did not dissipate when the troopers decided to relocate the vehicle so that a complete and thorough search of the vehicle could be executed in a safer location with better lighting. See *id.* ¶ 37 (a delay in searching a vehicle until it is relocated to a police station does not diminish the original justification for the warrantless search); *People v. Parker*, 354 Ill. App. 3d 40, 46 (2004) (the justification for a warrantless search does not diminish upon relocation of the vehicle to a police station; holding that officers were not required to obtain a search warrant before moving a car a short distance prior to searching the vehicle). The troopers had probable cause to search the vehicle without a warrant based on the canine's alert and Veryzer's knowledge that illegal drugs are typically transported from the west coast to east coast on interstate highways, including on I-80 where defendant was stopped, often times in vehicles rented by third parties, such as was the case with defendant. The probable cause that supported the warrantless roadside search of defendant's vehicle

continued to exist after the vehicle was relocated to a nearby police station to allow the troopers to conduct a thorough search of the vehicle.

¶ 34     In arguing that the probable cause in this case had dissipated after the troopers failed to find contraband during the roadside search, defendant cites the decision set forth by another panel of this court in *People v. Pulido*, 2017 IL App (3d) 150215. In *Pulido*, defendant's vehicle was stopped for speeding by an Illinois state trooper. *Id.* ¶ 14. Two minutes later, another trooper arrived on scene with his canine partner, and the canine performed a free-air sniff of defendant's vehicle, which resulted in the canine alerting to the driver's side door. *Id.* ¶¶ 15, 17. Both troopers searched the inside of the vehicle and the engine compartment, and they found no narcotics. *Id.* ¶ 21. Police relocated the defendant's vehicle to a nearby police station to further search the vehicle because it had begun raining and for safety concerns. *Id.* ¶¶ 22-23. Tubes containing methamphetamines wrapped with black tape were removed from the air filter of the defendant's vehicle. *Id.* ¶ 26. On appeal in *Pulido*, a panel of this court held the officers had improperly transported defendant's vehicle to the police station because the probable cause that had been developed during the traffic stop had dissipated when no drugs or hidden compartments were found during the roadside search of the vehicle. *Id.* ¶ 43.

¶ 35     We decline to follow *Pulido*. Based on probable cause, the officers conducted a roadside search of readily accessible areas in the vehicle and areas of the vehicle where drugs are typically hidden by drug traffickers. Inclement weather, the time of day with respect to the available lighting, and safety concerns due to being alongside the highway in the dark led to the decision to continue the search of defendant's vehicle by relocating the vehicle to a better-suited location. We do not believe that probable cause had dissipated just because the drugs were so well hidden and certain surrounding conditions made completing a thorough roadside search of the vehicle impractical. As discussed above, probable cause continued to exist after the vehicle was relocated. Therefore, the trial court did not err by denying defendant's motion to suppress evidence. Absent any error, there could be no plain error requiring a review of defendant's forfeited claim.

¶ 36     Additionally, in light of our holding that probable cause had not dissipated, we cannot say that defendant's counsel was ineffective for failing to assert such an argument in defendant's motion to suppress. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005) (to establish prejudice from counsel's failure to file a motion to suppress evidence, a defendant must show a reasonable probability that the motion would have been granted and the outcome of the trial would have been different). Accordingly, we affirm the judgment of the trial court.

¶ 37                                   CONCLUSION

¶ 38     For the foregoing reasons, the judgment of the circuit court of Henry County is affirmed.

¶ 39     Affirmed.

¶ 40     JUSTICE McDADE, dissenting:

¶ 41     The majority has affirmed the conviction of defendant, Steven Varnauskas, on two counts of controlled substance trafficking and his two concurrent 40-year sentences. In reaching that decision, the majority found that (1) the officer had probable cause to make the initial traffic stop because he had a reasonable belief that the statute pursuant to which he acted prohibited

what it, in fact, did not and (2) the probable cause generated by the canine drug alert was sufficient to allow the police to move the car from the highway to the police station to continue the previously abortive search for drugs. For the reasons that follow, I disagree with both findings and respectfully dissent.

¶ 42   The facts make clear that this was not a traffic stop effected to protect the safety of other drivers on the road; it was a criminal investigation followed by a search without formal fourth amendment protections. Officer Veryzer testified that he was specially trained for criminal "interdiction" patrols for the purpose of trolling the highway to discover and seize terrorists, stolen vehicles, narcotics, guns, and the currency derived from the sale of such contraband. He had completed over 305 hours of such training and had personally seized about 46 large loads of narcotics and participated in seizures by others. See generally *supra* ¶¶ 14-16.

¶ 43   Veryzer also explained that he had completed 10 weeks of training with his canine partner, he had been a certified canine handler for four years, and he and his dog had a procedural routine for a sniff. He did not explain why his dog wears two collars, what the purpose of the second collar might be, or why his trained dog did not alert the first time around defendant's vehicle but did on its second rotation.

¶ 44   While sitting in the median of I-80 during his November 14, 2014, patrol, Veryzer observed defendant's vehicle pass by. Although it was 11 p.m. and allegedly too dark on scene to find narcotics in the vehicle even at close range, he was able to see that the license plate was partially obscured by an empty bicycle rack on the back of the car. He executed a traffic stop for this suspected violation of section 3-413(b) of the Vehicle Code (625 ILCS 5/3-413(b) (West 2014)). Ostensibly because of something about this traffic violation, he walked his dog around the car for a drug sniff. The dog alerted the second time around, and Veryzer and a fellow officer who had arrived at the scene unsolicited began a search. During this search, characterized by the majority as "cursory" (*supra* ¶ 11), they examined general locations where they had found drugs stashed in earlier searches of other cars. These included the inside of all bags and all luggage in the trunk, the interior of the car, under the seats, under the dashboard, and inside the doors—an area accessed through Veryzer's use of a wedge to pry the doors apart and expose their interiors. Then, deciding it was too cold, too dark, and too unsafe to continue the search on the side of the highway, they moved the car to the Geneseo Police Department and quickly—within 10 to 15 minutes—discovered two kilograms of heroin and one kilogram of cocaine by the engine below the windshield.

¶ 45   Defendant was charged, his motion to suppress evidence was denied, and he was tried and convicted by a jury. His two convictions and resultant 40-year sentences are the subjects of this direct appeal.

¶ 46   With regard to the first issue, I disagree with the majority's finding that the trial court properly denied the motion to suppress evidence based on the supreme court's decision in *People v. Gaytan*, 2015 IL 116223. That decision analyzed the version of section 3-413(b) in effect at the time Gaytan had been arrested, not the amended version in effect when Varnauskas was stopped. The supreme court's analysis in *Gaytan* agreed with the analysis of the Fourth District, concluding that (1) the statute's language was ambiguous; (2) applying the rule of lenity, the statute, properly interpreted, only prohibited obstruction by materials actually attached to the license plate; and (3) the defendant had not actually violated the statute. However, the court also found that, because of the ambiguity, the officer's belief that Gaytan was in violation was objectively reasonable and the stop was, therefore, valid.

¶ 47    In the instant case, the majority has considered the language of the amended statute in effect at the time Varnauskas was stopped and has concluded

> "[t]he revised language of section 3-413(b) removed any ambiguity as to whether prohibited obstructions were only those attached to the license plate, making the statute clearly prohibitive of any materials that would obstruct the visibility of a license plate." *Supra* ¶ 25.

I agree that the revised language, construed in its totality and in context, does remove the prior version's ambiguity, but I would find the amended statute clearly and unambiguously establishes that the only obstructions prohibited by the statute are those caused by materials actually affixed to the license plate.

¶ 48    The statute in effect at the time Veryzer stopped Varnauskas on November 14, 2014, was the version as amended by Public Act 97-743 (eff. Jan. 1, 2013). It provided, in relevant part, as follows. Additions are shown in italics, and deletions are stricken through.

> "§ 3-413. Display of registration plates, registration stickers, and drive-away permits; *registration plate covers.*
>
> ***
>
> (b) Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so as to prevent the plate from swinging and at a height of not less than 5 inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible and shall be maintained in a condition to be clearly legible, free from any materials that would obstruct the visibility of the plate, ~~including, but not limited to, glass covers and plastic covers~~. *A registration plate on a motorcycle may be mounted vertically as long as it is otherwise clearly visible.* Registration stickers issued as evidence of renewed annual registration shall be attached to registration plates as required by the Secretary of State, and be clearly visible at all times.
>
> * * *
>
> *(g) A person may not operate any motor vehicle that is equipped with registration plate covers. A violation of this subsection (g) or a similar provision of a local ordinance is an offense against laws and ordinances regulating the movement of traffic.*
>
> *(h) A person may not sell or offer for sale a registration plate cover. A violation of this subsection (h) is a business offense.*
>
> *(i) A person may not advertise for the purpose of promoting the sale of registration plate covers. A violation of this subsection (i) is a business offense.*
>
> *(j) A person may not modify the original manufacturer's mounting location of the rear registration plate on any vehicle so as to conceal the registration or to knowingly cause it to be obstructed in an effort to hinder a peace officer from obtaining the registration for the enforcement of a violation of this Code, Section 27.1 of the Toll Highway Act concerning a toll evasion, or any municipal ordinance. Modifications prohibited by this subsection (j) include but are not limited to the use of an electronic device. A violation of this subsection (j) is a Class A misdemeanor.*" Pub. Act 97-743 (eff. Jan. 1, 2013) (amending 625 ILCS 5/3-413).

As can be seen, new subsections (g)-(i) replaced and amplified the clause concerning registration plate covers, which had been deleted from subsection (b). New subsection (j) prohibited any modification of the mounting location of the rear registration plate so as to conceal or obstruct the view of the registration plate.

¶ 49    There are three reasons why I believe the modified statute unambiguously addresses only the proper placement and display of license plates, registration stickers, and drive-away permits and penalizes only their improper placement and display. First is the plain language of the section's title and provisions, which conspicuously makes no mention of obstructions caused by attaching foreign objects to the vehicle itself.

¶ 50    My second reason derives from perceived skepticism of the *Gaytan* court about the reach of the statute suggested by the State in that case. The court noted how far-reaching such a restriction would be: "even a public bus equipped with a bicycle rack on its front would be unlawful under the State's reading of section 3-413(b) if the rack were to obstruct the license plate." *Gaytan*, 2015 IL 116223, ¶ 36. The court also said that it was reasonable "to conclude that the General Assembly did not intend to put companies who rent trailers out of business and did not intend to further burden the physically disabled by making it illegal for them to use wheelchair and scooter carriers—*particularly when the statute says nothing about these matters*." (Emphasis added.) *Id.* ¶ 38.

¶ 51    The third reason is that, even if the statutory language were ambiguous, the legislative history indicates the amendment was proposed because the Illinois State Police approached the legislature with some issues regarding registration plate covers. Representative Lisa Dugan stated on the date that the bill passed both houses that "this actually makes multiple Amendments to the Vehicle Code *with respect to registration plate covers and motorcycles* based on some issues that the State Police have seen around Illinois to just make things safer and to make [the] roads safer." (Emphasis added.) 97th Ill. Gen. Assem., House Proceedings, May 1, 2012, at 14 (statements of Representative Dugan).

¶ 52    For these reasons I would find (1) that the amended version of section 3-413 in effect at the time Veryzer stopped Varnauskas did not prohibit or criminalize the placement of the bicycle rack, (2) that Varnauskas was not in actual violation of the statute under which he was charged, and (3) that it was not objectively reasonable for Officer Veryzer to believe that the empty bicycle rack on the back of the vehicle was a violation of that statute. I would find the stop was without probable cause and therefore unjustified and improper and that the motion to suppress should have been granted.

¶ 53    Even though, based on my analysis of the first issue, there is no need to reach the second, I feel compelled to briefly address the majority's expressed refusal (*supra* ¶ 35) to follow this court's earlier decision in *People v. Pulido*, 2017 IL App (3d) 150215. In the instant case, when the decision was made to move defendant's vehicle to the Geneseo Police Department, the trooper had obviously completed any traffic mission he claimed to have had. Even if it had not been at the beginning, this was now nothing more than a drug investigation. If the officer believed he had probable cause for a search, he needed to get a warrant. Defendant had that right under the fourth amendment to the United States Constitution. Whatever urgency or exigency existed for a warrantless search on the side of the road dissipated once the vehicle and defendant were removed to the safety and less pressing conditions of the police station. For all of the reasons set out in its analysis, I believe *Pulido* to have been properly decided, and I dissent from the majority's contrary holding.